# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>**Jordon H. Kaiser,**<br><br>Debtor | Chapter 7<br><br>Case No. 11-41555<br><br>Hon. Timothy A. Barnes |
| **Deborah Kanner Ebner**, not individually but as Trustee of the Bankruptcy Estate of Jordon H. Kaiser,<br><br>Plaintiff,<br><br>v.<br><br>**Doris Kaiser**, individually and as Trustee of the Shellie Kaiser Trust, and as Trustee of the Amy Kaiser Wickersham Trust, and as Trustee of the Doris Kaiser Trust, *et al.*,<br><br>Defendants. | Adv. No. 13-01243 |

## PETER AND SCOTT KAISER'S ANSWER
## TO COMPLAINT FOR ACCOUNTING, TURNOVER,
## AND INVALIDATION OF TRANSFERS

Peter Kaiser ("Peter") and Scott Kaiser ("Scott") answer the Trustee's complaint as follows:

### JURISDICTIONAL ALLEGATIONS

1.    The Debtor commenced the above captioned bankruptcy case (the "*Case*") on October 12, 2011 (the "*Petition Date*"), by filing a voluntary petition for relief under chapter 7 of title 11, United States Code (the "*Bankruptcy Code*"), in the United

States Bankruptcy Court for the Northern District of Illinois, Eastern Division.

**ANSWER:    Admitted.**

2.    Deborah Kanner Ebner was appointed as the interim trustee in the
Case pursuant to § 701 of the Bankruptcy Code and she subsequently became the
permanent trustee. The Trustee is duly qualified and has all the powers of a trustee under,
amount other provisions, § 704 of the Bankruptcy Code.

**ANSWER:    Peter and Scott lack knowledge or information sufficient
to form a belief about the truth of the allegations of this paragraph.**

3.    Pursuant to 28 U.S.C. § 1334(b), this Court has subject matter
jurisdiction over this proceeding, which is referred here pursuant to 28 U.S.C. § 157(a) and
Local Rule 40.3.1(a) of the United States District Court for the Northern District of
Illinois.

**ANSWER:    Peter and Scott lack knowledge or information sufficient
to form a belief about the truth of the allegations of this paragraph.**

4.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E),
(H), and (O).

**ANSWER:    Admitted.**

5.    This Court is the proper venue for this adversary proceeding

pursuant to 28 U.S.C. §§ 1408 and 1409.

**ANSWER:    Admitted.**


## **DEFENDANTS AND THEIR RELATIONSHIP TO THE DEBTOR**

6.    The Debtor was an individual and resident of the State of Illinois.

After filing for bankruptcy the Debtor passed away. The Debtor's bankruptcy schedules

reflect over $18 million in obligations and $1,500 in assets. The schedules also are grossly

inaccurate and misleading. For example, the Debtor's bankruptcy schedules falsely

reflect that he owns interests in various limited liability companies indirectly through a

trust. The Debtor would frequently try to evade and mislead creditors by claiming

property was owned in a trust when, in fact, no such trust existed. By way of example

only, the Debtor asserted that his interest in KDI, LLC was owned directly or indirectly

through a trust when, in fact, the Debtor knew that he held an interest in KDI, LLC

directly in his own name. The operating agreement for KDI reflects that the Debtor had

a 40% interest in that entity. Similarly, the Debtor defrauded CIB Bank by asserting in

writing that 38% of the interests in KDI, LLC were owned by the Amy Wickersham Trust

and the Shellie Kaiser Trust when, in fact, that was not true and he knew it was not true.

The Debtor did this to deceive CIB Bank and its successors so that it would be hindered,

defrauded and delayed. The Debtor's schedules also failed to reflect that he directly

owned an interest in a condominium in Arlington Heights and that he owed a lender

approximately $1 million on account of the mortgage on the condominium. These are

but a few of the falsehoods in the Debtor's schedules.

**ANSWER:    Peter and Scott admit that the Debtor was an individual, a resident of Illinois, and that he passed away, but they lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.**

7.     Doris Kaiser ("*Doris*") is an individual and resident of the State of Illinois.  Doris married the Debtor at some time in the 1940s.  As alleged below, the Debtor transferred or tried to transfer millions in property to Doris in order to keep the property away from his creditors. For example, in response to a deposition taken in December of 2010, the Debtor stated that "My wife is the actual owner" of the Lakeshore Athletic Clubs. Similarly, the Debtor transferred to Doris Kaiser his interest in a multi-million dollar home in California in 2006 and his interest in a multi-million dollar home in Glencoe, Illinois, in 2003.

**ANSWER:    Peter and Scott admit that Doris is an individual, a resident of Illinois, and that she married the Debtor at some time in the 1940s, but they lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.**

8.     On January 21, 2000, Doris executed an Illinois Statutory Short Form Power of Attorney for Property (the "*Doris Power of Attorney*") in favor of the Debtor. That document granted the Debtor broad power and discretion related to and regarding the personal property of Doris without restriction. The power of attorney essentially

5

allowed the Debtor to use Doris to sequester his property. As alleged below, Doris did not earn any separate income and all of the property she accumulated was a result of the Debtor parking it in her name.

**ANSWER:** **Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

9.   Also, in a December 2010 deposition, the Debtor indicated that in the prior five years all of the companies in which he was involved were in his wife's name, stating that "My wife had all the ownership interests the last five years" and "My wife owned them and she [k]new."

**ANSWER:** **Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

10.   Shellie Kaiser ("*Shellie*") is an individual and resident of the State of Illinois.  Shellie is the Debtor's daughter.  Shellie is a defendant as a result of receiving approximately $1 million from the sale of real estate indirectly owned by the Debtor and held in the name of KDI, LLC. The Trustee reserves the right to recover additional property the Debtor either transferred to or for the benefit of Shellie or asked Shellie to hold for his benefit.

**ANSWER:** **Peter and Scott admit that Shellie is an individual, a resident of Illinois, and the Debtor's daughter, but they lack knowledge or information sufficient to form a belief about the truth of the remaining**

**allegations of this paragraph.**

11.     On September 19, 2003, Shellie executed an Illinois Statutory Short Form Power of Attorney for Property (the "*Shellie Power of Attorney*") in favor of the Debtor, which granted the Debtor broad power and discretion related to and regarding the personal property of Shellie without restriction.

**ANSWER:     Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

12.     Amy Wickersham Kaiser ("*Amy*") is an individual and resident of the State of New York. Amy is also the Debtor's daughter. Amy is a defendant as a result of receiving approximately $1 million from the sale of real estate indirectly owned by the Debtor and held in the name of KDI, LLC. Amy also is a defendant as a result of a having received $300,000 in January of 2007, from a company the Debtor controlled. The Trustee reserves the right to recover additional property the Debtor either transferred to or for the benefit of Amy or asked Amy to hold for his benefit.

**ANSWER:     Peter and Scott admit that Amy is an individual, a resident of New York, and the Debtor's daughter, but they lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.**

13.     John Wickersham ("*John*") is an individual and resident of the State

of New York. John is Amy's husband and thus the Debtor's son-in-law. John and Amy have been married at all times relevant to this Complaint. The Debtor considered John to be the business adviser for the Kaiser family's business affairs. John has been named as a defendant as a result of having received several transfers of property from the Debtor and as a result of his role as the Kaiser family financial advisor. The Trustee reserves the right to recover additional property the Debtor either transferred to or for the benefit of John or asked John to hold for his benefit.

**ANSWER:    Peter and Scott admit that John is an individual, a resident of New York, and Amy's husband and thus the Debtor's son-in-law, but they lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.**

14.    Walter Kaiser ("*Walter*") is an individual and resident of the State of Illinois. Walter is the Debtor's brother. Walter has been named as a defendant as a result of the close financial connection between Walter and the Debtor, because Walter is a co-obligor on certain obligations owed by the Debtor and because Walter was the recipient or beneficiary of certain transfers from Lakeshore Centre Holdings, LLC, that, on information and belief, appear to have been made for less than reasonably equivalent value. The Trustee reserves the right to recover additional property the Debtor either transferred to or for the benefit of Walter or asked Walter to hold for his benefit.

**ANSWER:    Peter and Scott admit that Walter is an individual, a resident of Illinois, and the Debtor's brother, but they lack knowledge or**

**information sufficient to form a belief about the truth of the remaining**

**allegations of this paragraph.**

15.    The Lakeshore Centre Holdings, LLC ("*Holdings*") is an Illinois

limited liability company. The Debtor and Walter used accounts in the name of Holdings

as a central depository to transfer money to other operating accounts for businesses they

owned and operated. The Debtor also transferred substantial property to or for the

benefit of Holdings and Holdings transferred substantial property to or for the benefit of

insiders of the Debtor.

**ANSWER:    Peter and Scott lack knowledge or information sufficient**

**to form a belief about the truth of the allegations of this paragraph.**

16.    The Kaiser Family 2001 Irrevocable Trust (the "*2001 Family Trust*")

dated 11/30/2001 purports to be a trust used by the Debtor and, on information and belief,

members of his family to shield assets from creditors. Shellie Kaiser and Amy Kaiser

Wickersham are joint trustees of the 2001 Family Trust.

**ANSWER:    Peter and Scott admit on information and belief that the**

**2001 Family Trust exists, but they lack knowledge or information sufficient to**

**form a belief about the truth of the remaining allegations of this paragraph.**

17.    The 2001 Family Trust is the owner and beneficiary of a life insurance

policy—policy no. 7400267 ("*Policy 267*")—with MetLife (as defined below) with a face

9

value of $5,000,000. On information and belief, notwithstanding his insolvency, the Debtor continued to funnel funds into Policy 267 as a way to indirectly give money to his children.

**ANSWER:    Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

18.    The Kaiser Family Trust (the "*1989 Family Trust*") dated 12/28/1989 purports to be a trust used by the Debtor and, on information and belief, members of his family to shield assets from creditors. Shellie Kaiser and Amy Kaiser Wickersham are joint trustees of the 1989 Family Trust.

**ANSWER:    Peter and Scott admit on information and belief that the 1989 Family Trust exists, but they lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.**

19.    The 1989 Family Trust is the owner and beneficiary of a life insurance policy—policy no. L011245830 ("*Policy 830*")—with North American (as defined below) with a face value of $2,000,000. On information and belief, notwithstanding the Debtor's insolvency, he continued to funnel funds into Policy 830 as a way to indirectly give money to his children.

**ANSWER:    Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

20.    The Kaiser Children's Trust (the "*Children's Trust*") dated 9/15/89 purports to be a trust used by the Debtor and, on information and belief, members of his family to shield assets from creditors. Doris was the original trustee of the Children's Trust, but she later resigned and Shellie and Amy became successor joint trustees of the Children's Trust.

**ANSWER:    Peter and Scott admit on information and belief that the Children's Trust exists and that Shellie and Amy may have become successor joint trustees of the Children's Trust, but they lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.**

21.    The Children's Trust is the owner and beneficiary of a life insurance policy—policy no. 60069882 ("*Policy 882*")—with Transamerica (as defined below) with a face value of $3,000,000.  On information and belief, notwithstanding the Debtor's insolvency, he continued to funnel funds into Policy 882 as a way to indirectly give money to his children. Each of the Debtor's three children—Amy, Shellie, and Jeffrey—were to receive one third of the payout from Policy 882 through trusts created by the Children's Trust in each of their names upon the death of Doris and the Debtor. Each child is successor trustee for each trust created by the Children's Trust bearing that child's name.

**ANSWER:    Peter and Scott admit the existence of Policy 882, that it is with Transamerica, that the Children's Trust is its owner and beneficiary, and that it has a face value of $3,000,000, but they lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this**

**paragraph.**

22.     The Shellie Kaiser Trust (the "*Shellie Trust*") dated 12/1/1999 is named as a defendant to the extent it is a legally separate entity from Shellie Kaiser. The Shellie Trust was created by the Kaiser 1999 Trust. As of the date the Kaiser 1999 Trust was created, it was split into two equal shares between the Shellie Trust and the Amy Trust (as defined below). The Debtor was the original trustee of the Shellie Trust and Shellie was the beneficiary. On or about November 29, 2000, the Debtor resigned as trustee of the Shellie Trust and Amy and Doris purportedly accepted appointment as successor trustees. There may also have been an amendment or restatement of the Shellie Trust on or around September 19, 2003. On information and belief the Shellie Trust was created to gift the Debtor's assets to Shellie and shield them from his creditors.

**ANSWER:     Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

23.     The Amy Kaiser Wickersham Trust (the "*Amy Trust*") dated 12/1/1999 is named as a defendant to the extent it is a legally separate entity from Amy Kaiser Wickersham.  The Amy Trust was created by the Kaiser 1999 Trust. As of the date the Kaiser 1999 Trust was created, it was split into two equal shares between the Shellie Trust and the Amy Trust. The Debtor was the original trustee of the Amy Trust and Amy was the beneficiary. On or about November 29, 2000, the Debtor resigned as trustee of the Amy Trust and Shellie and Doris purported to accept appointment as successor trustees.

There may also have been an amendment or restatement of the Amy Trust on or around

September 19, 2003. On information and belief the Amy Trust was created to gift the

Debtor's assets to Amy and shield them from his creditors.

**ANSWER:    Peter and Scott lack knowledge or information sufficient
to form a belief about the truth of the allegations of this paragraph.**


24.    The Doris Kaiser Trust (the "*Doris Trust*") dated 9/15/2000 is named

as a defendant to the extent it is a separate legal entity from Doris. Doris is the trustee of

the Doris Trust. On or about October 10, 2003, the Debtor's multimillion dollar estate

located at 580 Westley Ave., Glencoe, Illinois, inclusive of a tennis court and swimming

pool, was transferred from a trust owned and controlled by the Debtor to the Doris Trust.

On or about April 13, 2006, Jordon and Doris jointly and individually deeded their

multimillion dollar winter home located at 33 Mirada Circle, Rancho Mirage, California,

to the Doris Trust.

**ANSWER:    Peter and Scott lack knowledge or information sufficient
to form a belief about the truth of the allegations of this paragraph.**


25.    KDI, L.L.C., ("*KDI*") is an Illinois limited liability company that was

involuntarily dissolved in April 2008. KDI directly or indirectly owned real property

located at Belmont and Sheffield in Chicago. That property was sold for approximately

$13,700,000 in 2004. The net proceeds from the sale appear to have flowed to Sheffield

Investments, L.L.C., and then to KDI.

13

**ANSWER:    Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

26.    Sheffield Investments, L.L.C., ("*Sheffield*") is an Illinois limited liability company that was involuntarily dissolved in February 2006. KDI owned an 89% membership interest in Sheffield. The member managers of Sheffield were Richard Hall and Walter.

**ANSWER:    Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

27.    Belmont Sheffield, L.P., ("*Belmont*") is an Illinois limited partnership that was dissolved as of June 16, 2006. As stated, KDI was an 89% owner of Sheffield, and in turn, Sheffield was a limited partner with a 90.479% interest in Belmont. Belmont directly or indirectly owned the property at Belmont and Sheffield sold in 2004 for $13,700,000.

**ANSWER:    Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

28.    Kaiser Investments, L.L.C., is an Illinois limited liability company that was involuntarily dissolved in September 2009. The member managers of Kaiser Investments were the Debtor and Walter.

**ANSWER:    Peter and Scott lack knowledge or information sufficient**

14

**to form a belief about the truth of the allegations of this paragraph.**

29.   Metropolitan Life Insurance Company ("*MetLife*") is a Delaware corporation with it principal place of business in New York, New York.  MetLife issued Policy 267 with a face value of $5,000,000 owned by the 2001 Family Trust. On information and belief, notwithstanding his insolvency, the Debtor continued to funnel funds into Policy 267 as a way to indirectly give money to his children.

**ANSWER:   Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

30.   MetLife also issued policy no. 7400255 ("*Policy 255*") insuring the Debtor's life. Doris was the sole owner and beneficiary of Policy 255. Policy 255 had a face value of $250,000. On information and belief, notwithstanding his insolvency, the Debtor continued to funnel funds into Policy 255 as a way to indirectly give money to his wife, Doris.

**ANSWER:   Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

31.   Transamerica Life Insurance Company ("*Transamerica*") is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. Transamerica issued Policy 882 with a face value of $3,000,000 owned by the Children's Trust. On information and belief, notwithstanding his insolvency, the Debtor continued to funnel

funds into Policy 882 as a way to indirectly give money to his children.

**ANSWER:**   **Peter and Scott admit the existence of Policy 882, that it is with Transamerica, that the Children's Trust is its owner and beneficiary, and that it has a face value of $3,000,000, but they lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.**

32.   North American Company for Life and Health Insurance ("*North American*") is an Iowa corporation with its principal place of business in Des Moines, Iowa. North American issued Policy 830 owned by the 1989 Family Trust with a face value of $2,000,000. On information and belief, notwithstanding his insolvency, the Debtor continued to funnel funds into Policy 830 as a way to indirectly give money to his children.

**ANSWER:**   **Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

33.   American General Life Insurance Company ("*American General*") is a Delaware corporation with its principal place of business in Wilmington, Delaware. American General also issued policy no. B01101039L ("*Policy 39L*") insuring the Debtor's life. The Debtor was the sole owner and Doris was the sole beneficiary of Policy 39L. Policy 39L has a face value of $250,000. On information and belief, notwithstanding his insolvency, the Debtor continued to funnel funds into Policy 39L as a way to indirectly

16

give money to his wife, Doris.

**Answer:      Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

34.      In connection with the insurance issued by the above companies (collectively, the "*Insurance Companies*"), the Debtor attempted to gift $10,000,000 to his children and $500,000 to his wife by continuing to pay insurance premiums costing over $300,000 annually. At the same time, millions of dollars in judgments were being entered against him.

**ANSWER:      Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

35.      MB Financial Bank, N.A., ("*MB*") is a national bank association that does business in the state of Illinois. MB held the main operating accounts for Holdings, the Debtor, various trusts, and various other defendants for substantial time periods relevant to this Complaint.

**ANSWER:      Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

36.      All of the defendants in this action are insiders of the Debtor, except for MetLife, MB, Transamerica, North American, and American General.

**ANSWER:      Peter and Scott admit that they and certain other**

**defendants are relatives of the Debtor, but they lack knowledge or information**

**sufficient to form a belief about the truth of the remaining allegations of this**

**paragraph.**


## BACKGROUND AND FACTS COMMON TO ALL COUNTS

37.     Prior to the Petition Date, the Debtor enjoyed an affluent lifestyle.

For example, he owned a large house worth several million dollars located in Glencoe,

Illinois, an upscale Northshore community (the "*Glencoe Estate*"). The Glencoe Estate

housed over $500,000 in personal property, inclusive of hundreds of thousands of dollars

of fine arts, jewelry, furs, and silverware. It was also a personal recreational facility with

an outdoor swimming pool and tennis court. If that was not enough, the Glencoe Estate

butted up against a golf course on two sides. The Glencoe Estate bordered on extravagant.

**ANSWER:     Peter and Scott admit that the Debtor resided on**

**occasion in a house in Glencoe, Illinois, but they lack knowledge or information**

**sufficient to form a belief about the truth of the remaining allegations of this**

**paragraph.**


38.     The Debtor also owned a second home in Riverside County in

Southern California (the "*California Property*") where the Debtor and his wife Doris

regularly "wintered." The California Property was also worth several million dollars and

boasted an outdoor pool and hot tub.

**ANSWER:     Peter and Scott admit on information and belief that the**

18

**Debtor and Doris on occasion resided in a home in Riverside County, California, but they lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.**

39.    The Debtor also was the majority owner of a group of several health clubs in the Chicagoland area, as well as various real estate developments. The Debtor and Doris always drove luxury vehicles over the years, including BMWs and Mercedes, even while claiming pauper status in court. And the Debtor even owned a watch worth over $15,000.

**ANSWER:    Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

40.    Doris was not employed during the course of her marriage to the Debtor, and thus, on information and belief, virtually all of the real estate and personal property owned by the Debtor and Doris was purchased with money earned by the Debtor or based upon his credit.

**ANSWER:    Peter and Scott admit on information and belief that Doris was not employed during the course of her marriage to the Debtor, but they lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.**

19

I.      **The Debtor's Financial Empire Crumbles.**

41.      Commencing in the early 2000s, if not earlier, the Debtor's financial empire began to crumble.

**ANSWER:      Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

42.      As the Debtor admitted in sworn testimony, the Debtor's health clubs began to have financial problems by at least 2003.

**ANSWER:      Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

43.      The Debtor also encountered problems with a project the Debtor was developing at 720 West Randolph (the "*Randolph Property*") in Chicago. The Debtor testified in litigation related to that project that the opening was delayed by approximately two years due to issues with the contractor. The Debtor had guaranteed approximately $8 million of the debt on that property and was also liable to others on account of that project.

**ANSWER:      Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

44.      For example, in 2008, the Circuit Court of Cook County held the Debtor in contempt for failing to pay over $400,000 to Chicago Title Insurance Co. related

to the Randolph Property. In an effort to purge that contempt, the Debtor testified in

2008 that he lacked the resources to pay the debt and had few resources.

**ANSWER:     Peter and Scott lack knowledge or information sufficient**

**to form a belief about the truth of the allegations of this paragraph.**

**II.      The Debtor Transferred Substantial Funds to or for the Benefit of
Insiders at a Time of Financial Distress.**

45.     As things began to unravel the Debtor became more and more

generous to his family.

**ANSWER:     Peter and Scott lack knowledge or information sufficient**

**to form a belief about the truth of the allegations of this paragraph.**

46.     In 2001 the Debtor took out an additional life insurance policy,

Policy 882 with Transamerica, naming the Children's Trust as the owner and beneficiary

while saddling himself with annual premium of more than $72,000. In 2002, the Debtor

took out Policy 267, naming the Family Trust as the owner and beneficiary. That policy

required an astonishing $185,000 annual premium. Also in 2002, the Debtor took out

Policy 255 naming Doris as the owner and beneficiary with a premium of more than

$10,000 a year.

**ANSWER:     Peter and Scott admit the existence of Policy 882, that it**

**is with Transamerica, and that the Children's Trust is its owner and beneficiary,**

**but they lack knowledge or information sufficient to form a belief about the truth**

**of the remaining allegations of this paragraph.**

21

47.    In 2003, the Debtor transferred his interest in the Glencoe Estate to Doris for no consideration. The Debtor indicated on his financial statements at the time that the property was worth approximately $3 million. In subsequent litigation, the Debtor falsely testified that the property had been in his wife's name for decades when, in fact, the property had relatively recently been transferred to Doris.

**Answer:**      **Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

48.    At around the same time, the Debtor also transferred interest in several of his companies to his children or their various trusts, including interests in Randolph Associates.

**Answer:**      **Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

49.    During this time of distress, at least since 2003, the Debtor was endorsing his monthly annuity checks from Jackson National Insurance Company, in the amount of $514 each, to Doris, even though the Debtor was the owner of the annuity and all checks were made payable to him alone. Between 2007 and 2011, there were no fewer than 27 such checks in an aggregate amount of $13,878 endorsed to Doris and deposited in a bank account at BMO Harris in Doris's name alone. The Debtor deposited a significant number of his Social Security benefit checks in the same account in Doris's name alone during this period as well.

**ANSWER:    Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

50.    In 2006, the Debtor transferred his interest in the California Property to Doris for no consideration. The Debtor indicated on his financial statements during that time that the California Property was worth approximately $4 million.

**ANSWER:    Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

51.    The Debtor transferred or caused to be transferred in 2004 and 2005 more than $2 million to Amy and Shellie in connection with the sale of the Belmont/Sheffield Properties.

**ANSWER:    Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

52.    On December 26, 2008, the Debtor transferred $90,000 to John. The Debtor also made other transfers to John, including $75,000 in November or December of 2009.

**ANSWER:    Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

53.    The Debtor also transferred substantial property in which he had an

23

interest to Holdings. For example, on January 17, 2008, Linda White, an employee of

Lakeshore Athletic Clubs directed MB Financial to "draw $100,000 from Jordon Kaisers

equity line a/c number 136650565 and deposit to Kaiser Investments checking a/c number

168377" and then to "wire transfer $100,000 from Kaiser Investments a/c number 168377"

to an account at JP Morgan Chase in the name of Holdings.

> **ANSWER:    Peter and Scott lack knowledge or information sufficient
> to form a belief about the truth of the allegations of this paragraph.**

54.    Additionally, on January 23, 2008, Linda White directed MB to "draw

$50,000.00 from Jordons equity line a/c 136650565 and deposit to his personal account

521081." On information and belief, that $50,000 was then transferred to Holdings, LLC.

> **ANSWER:    Peter and Scott lack knowledge or information sufficient
> to form a belief about the truth of the allegations of this paragraph.**

55.    On March 13, 2008, Linda White again directed MB to "advance

$150,000 from Jordon Kaisers equity line a/c 137750576 and wire" the funds to Holdings.

> **ANSWER:    Peter and Scott lack knowledge or information sufficient
> to form a belief about the truth of the allegations of this paragraph.**

56.    On January 29, 2008, Linda White again directed MB to "advance

$200,000 from Jordon Kaisers equity line a/c number 136650565 and wire transfer as

soon as possible the $200000 to" Holdings.

**ANSWER:     Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

57.     Additionally, in July of 2010, $100,000 was transferred from an account in the name of Doris to MB Financial in connection with an obligation owed by the Debtor. On information and belief, the Debtor had an interest in the $100,000 transfer because Doris did not have an independent source of income and all of her assets were provided by the Debtor.

**ANSWER:     Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

58.     On or about July 13, 2009, the Debtor executed in favor of the Doris Trust a balloon note in the aggregate principal amount of $2,875,000. A copy of the balloon note is appended as Exhibit A, and made a part hereof. An exhibit to the balloon note references various transfers purportedly made by the Doris Trust to the Debtor and various transfers made by the Debtor to the Doris Trust. Several of the transfers on the exhibit to the balloon note directly correlate with transfers the Debtor made to Holdings. On information and belief, the purpose of the balloon note, which was secured by the Debtor's interests in various companies, including Holdings, was to allow the Debtor or his wife to recover the value of the Debtor's various companies ahead of his creditors and to thereby defraud his creditors.

**ANSWER:     Peter and Scott lack knowledge or information sufficient**

to form a belief about the truth of the allegations of this paragraph.

III.    The Randolph Property and the KDI Fraud.

59.    While becoming more generous with his family, the Debtor became
shiftier with his creditors.

ANSWER:    Peter and Scott lack knowledge or information sufficient
to form a belief about the truth of the allegations of this paragraph.

60.    The original financing for the Randolph Property was provided by
CIB Bank. CIB loaned Randolph Associates approximately $21 million in or around
December of 2000 (the "*CIB Loan*") and, as noted above, in 2002, the Debtor guaranteed
certain of the obligations of Randolph Associates to CIB Bank.

ANSWER:    Peter and Scott lack knowledge or information sufficient
to form a belief about the truth of the allegations of this paragraph.

61.    Randolph Associates and CIB Bank entered into several loan
amendments as a result of the occurrence of various events of default or maturity dates.

ANSWER:    Peter and Scott lack knowledge or information sufficient
to form a belief about the truth of the allegations of this paragraph.

62.    Pursuant to a Third Loan Amendment, dated October 21, 2003, the
Debtor executed a Pledge Agreement as additional collateral for repayment of the CIB

26

Loan (the "*First Pledge Agreement*"). The First Pledge Agreement obligated the Debtor to provide CIB Bank with a security interest in the Debtor's right to receive the proceeds payable in connection with the sale of certain real property located at 1001 West Belmont and 3146 North Sheffield, Chicago (the "*Belmont/Sheffield Property*"). The First Pledge Agreement further provided that upon the sale of all or part of the Belmont/Sheffield Property, the Debtor would give CIB notice of the sale and cause any and all net sale proceeds from such sale to be remitted to CIB, to be deposited in a certain bank account, as security for the repayment of the CIB Loan.

**ANSWER:    Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

63.    The Debtor also represented in the First Pledge Agreement that he owned 40% of KDI, which was the entity that ultimately controlled the Belmont/Sheffield Property and that was entitled to the sale proceeds. This is consistent with the operating agreement for KDI, which provides that the Debtor owned 40% of KDI.

**ANSWER:    Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

64.    On January 21, 2004, CIB and Randolph Associates entered into a Fourth Amendment to the Loan Agreement, which obligated Randolph Associates to substitute certain new collateral for the collateral that was previously provided under the Third Amendment.

27

**ANSWER:**   **Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

65.   As additional new collateral for the repayment of the CIB Loan, CIB received a Pledge Agreement (the "*Second Pledge Agreement*") that was executed by the Debtor.  The Pledge agreement was also purportedly signed by Shellie and Doris, in their capacities as successor Trustees of the Amy Trust, and Doris and Amy, in their capacities as the successor Trustees of the Shellie Trust.

**ANSWER:**   **Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

66.   During oral examinations of Amy and Shellie, both stated under oath that the signatures on the Second Pledge Agreement were not theirs, and that someone else had signed the document without their knowledge. On information and belief, the Debtor signed their names to the document in order to defraud CIB Bank.  Amy also has indicated that she did not know that she had an interest in KDI. By executing the Fourth Amendment, the Debtor defrauded CIB Bank by purporting to pledge the sale proceeds from the Belmont/Sheffield Property.  The Debtor knew that the Amy Trust and the Shellie Trust did not have any interest in the proceeds from the sale of the Belmont/Sheffield Properties.

**ANSWER:**   **Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

28

67.     The Belmont/Sheffield Property was sold on or about November 15, 2004.  In violation of the express requirements and representations contained in the Second Pledge Agreement and the First Pledge Agreement, the Debtor caused proceeds from the sale of the Belmont/Sheffield Property (the "*Belmont/Sheffield Proceeds*") to be paid directly to Amy and Shellie.  This happened in 2004 and 2005.

**ANSWER:     Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

68.     Specifically, during 2004, Amy and Shellie each received approximately $545,907 in connection with the sale of the Belmont/Sheffield Property. Amy and Shellie also each received a like amount in 2005 in connection with the sale of the Belmont/Sheffield Property.

**ANSWER:     Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

69.     On January 30, 2007, Amy also received a $300,000 check drawn under an account in the name of Kaiser Family Ltd. Partnership. Amy did not know why she received this check. On information and belief, this check represents the Debtor's property that he was transferring to his daughter.

**ANSWER:     Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

70.     When the Debtor was asked in a deposition taken on August 30, 2007, why he did not cause the proceeds from the sale of the Belmont/Sheffield Property to be transferred to CIB Bank or its successor, the Debtor stated in substance that he did not think that CIB Bank deserved the funds and thus he directed that the funds be paid to his children.

**Answer:     Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

**IV.     The Debtor's Insurance Policies.**

71.     As stated above, the Debtor decided to supersize his life insurance during his lifetime.

**ANSWER:     Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

72.     In a 2009 memorandum, John (the Debtor's son in law) indicated that the Debtor had an estate worth almost $10 million, much of which included interests in insurance policies.  A copy of that memorandum is attached as Exhibit B.

**ANSWER:     Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

73.     As noted in the attached letter from Preferred Planning Concepts, LLC, a copy of which is attached as Exhibit C, the policies included: (a) a $2,000,000 policy with North American, (b) a $3,000,000 policy with Transamerica; and (c) a

$5,000,000 policy with MetLife (formerly Travelers).

> **ANSWER:** **Peter and Scott admit the existence of the Transamerica policy, but they lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.**

74.    The Debtor used various insurance policies to transfer assets out of the reach of his creditors and to or for the benefit of his family members. The following chart identifies some, but not all of the transfers the Debtor made directly to Insurance Companies at a time when he was unable to pay his debts as they became due:

| Insurance | Check Date | Check Amount | Policy # |
|---|---|---|---|
| MetLife | 12/5/2008 | $38,860.00 | 7400267 |
| MetLife | 7/3/2008 | $40,642.00 | 7400267 |
| Transamerica | 3/27/2008 | $18,000.00 | 60069882-01 |
| MetLife | 3/27/2008 | $36,645.00 | 7400267 |
| MetLife | 1/10/2008 | $19,465.83 | 7400255 |
| MetLife | 1/25/2008 | $43,000.00 | 7400267 |
| MetLife | 11/28/2007 | $34,202.34 | 7400267 |
| North American | 10/29/2007 | $10,188.00 | L011245830 |
| North American | 8/20/2007 | $10,188.00 | L011245831 |
| North American | 5/23/2007 | $10,188.00 | L011245832 |
| Transamerica | 3/27/2007 | $72,272.90 | 60069882-01 |
| North American | 2/3/2007 | $10,188.00 | L011245832 |
| American | 5/15/2008 | $6,710.00 | B01101039L |

31

| Insurance | Check Date | Check Amount | Policy # |
|---|---|---|---|
| North American | 7/17/2006 | $10,188.00 | L011245832 |
| North American | 1/24/2006 | $10,188.00 | L011245832 |
| Travelers Life | 1/27/2006 | $50,000.00 | 7400267 |
| Travelers Life | 1/27/2006 | $19,465.00 | 7400255 |
|  |  |  |  |
|  | TOTAL: | $440,391.07 |  |

**ANSWER:**    **Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

**V.      The Trustee's Standing.**

75.     At all times relevant to the allegations herein, there existed a creditor with standing to challenge the transactions set forth herein. For example, CIB Bank and then its successor in interest, Mountaineer Investments, was a creditor of the Debtor since at least 2002 as a result of the approximately $8 million guaranty that the Debtor signed in favor of CIB related to the Randolph Property.

**ANSWER:**    **Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.**

76.     Additionally, the Internal Revenue Service is a creditor of the Debtor by virtue of having filed a proof of claim against the Debtor's bankruptcy estate for prepetition taxes.

**ANSWER:** Peter and Scott lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

**COUNT 1.     DECLARATORY JUDGMENT RELATED TO ESTATE PROPERTY – BELMONT/SHEFFIELD PROCEEDS AND $300,000 TRANSFER.**

**ANSWER:** Count 1 of the complaint (Paragraphs 77 through 82) is not directed at Peter and Scott, and therefore no answer is required of them. In the alternative, Peter and Scott generally deny Count 1 and request judgment in their favor on Count 1.

**COUNT 2.     TURNOVER OF ESTATE PROPERTY.**

**ANSWER:** Count 2 of the complaint (Paragraphs 83 through 87) is not directed at Peter and Scott, and therefore no answer is required of them. In the alternative, Peter and Scott generally deny Count 2 and request judgment in their favor on Count 2.

**COUNT 3.     ACCOUNTING AND CLAIM AGAINST LAKESHORE CENTRE HOLDINGS, LLC.**

**ANSWER:** Count 3 of the complaint (Paragraphs 88 through 91) is not directed at Peter and Scott, and therefore no answer is required of them. In the alternative, Peter and Scott generally deny Count 3 and request judgment in their favor on Count 3.

**COUNT 4.     ACTUAL FRAUDULENT TRANSFERS.**

   **ANSWER:** Count 4 of the complaint (Paragraphs 92 through 99) is not directed at Peter and Scott, and therefore no answer is required of them.  In the alternative, Peter and Scott generally deny Count 4 and request judgment in their favor on Count 4.

 **COUNT 5.     CONSTRUCTIVE FRAUDULENT TRANSFERS.**

   **ANSWER:** Count 5 of the complaint (Paragraphs 100 through 106) is not directed at Peter and Scott, and therefore no answer is required of them.  In the alternative, Peter and Scott generally deny Count 5 and request judgment in their favor on Count 5.

 **COUNT 6.     UNJUST ENRICHMENT.**

   **ANSWER:** Count 6 of the complaint (Paragraphs 107 through 110) is not directed at Peter and Scott, and therefore no answer is required of them.  In the alternative, Peter and Scott generally deny Count 6 and request judgment in their favor on Count 6.

**COUNT 7.    ACCOUNTING AGAINST MB.**

**ANSWER:    Count 7 of the complaint (Paragraphs 111 through 121) is not directed at Peter and Scott, and therefore no answer is required of them.  In the alternative, Peter and Scott generally deny Count 7 and request judgment in their favor on Count 7.**

## DEFENSE

The complaint does not allege either allegations of fact or legal claims against Peter and Scott, and therefore the complaint fails to state a cause of action against them for which relief may be granted.

WHEREFORE, Peter and Scott Kaiser request that the complaint against them be dismissed with prejudice, that judgment in their favor be entered, and that they be awarded all costs, including attorneys' fees, and other relief to which they may be entitled.

Date:  April 11, 2014

Respectfully submitted,

PETER KAISER and SCOTT KAISER

By:   _/s/  Ronit C. Barrett_____
        One of their Attorneys

Scott C. Solberg
Ronit C. Barrett
James W. Joseph
Eimer Stahl LLP
224 South Michigan Ave., Suite 1100
Chicago, Illinois 60604
(312) 660-7600
(312) 692-1718 (fax)
ssolberg@eimerstahl.com
rbarrett@eimerstahl.com
jjoseph@eimerstahl.com

## Certificate of Service

I, Ronit C. Barrett, an attorney, certify that a true and correct copy of

Peter and Scott Kaiser's Answer to Complaint for Accounting, Turnover, and

Invalidation of Transfers was filed with the Clerk of the U.S. Bankruptcy Court, Northern

District of Illinois, using the CM/ECF filing system, which caused a copy to be

electronically mailed to all CM/ECF participants registered to receive electronic notices

in the above captioned case.


/s/ Ronit C. Barrett
Ronit C. Barrett